CADBURY v. DUVAL.—Appeal by the FRANKLIN FIRE INSURANCE COMPANY.

*A sale under a testamentary power for the payment of unscheduled debts, discharges the land from the statutory lien of testator's debts.*

*And an executor may purchase from the trustees at such sale.*

*A. devised the residue of his real estate to B. his wife, for life, who was also executrix, and to trustees, subject to her life-estate, in trust to sell and pay debts not otherwise provided for. The trustees conveyed to B., under the power, for a consideration mentioned in the deed, but not in fact paid. B. mortgaged the land, and it was sold by the sheriff under the mortgage. The mortgagee has priority in the distribution over creditors of the testator, who have obtained judgment within five years from his death.*

FROM the District Court of Philadelphia.

*April* 16. James Duval, by his will, devised certain real estate specifically, and the residue to his wife Catherine for life, remainder to his children, and appointed his wife executrix. By a codicil he devised the residue of his real estate, subject to the life-estate of his wife, to his son Lewis, and his sons-in-law Wagner and Rodney, and the survivors of them, in fee, in trust, to sell and dispose of such parts as were not specifically devised, either at public or private sale at their discretion, and to execute deeds—the nett proceeds to be first applied to the payment of any of his debts "to which the same may be subject, and *is* not otherwise provided for;" the surplus to be distributed by the trustees among his children.'

The testator died in April, 1842, indebted, among others, to the appellants. In December, 1842, the trustees, under the power in the will, conveyed certain land, being part of the residue devised to them, to Catherine, the widow, in fee. The consideration expressed in the deed was $7,000, but no money was paid. At the time of this transfer, the appellants had not obtained a judgment. In February, 1843, Catherine Duval mortgaged the land to Parker for $7,000, and it having been sold by the sheriff under this mortgage, the question arose on the distribution of the funds. The appellants claimed as creditors of the testator, under a judgment for a debt of the decedent, obtained in 1845, but the court awarded the fund to the mortgagee.

*T. J. Wharton,* for the appellants.—The debts of the decedent were liens on his land and the life-estate of Mrs. Duval not having been sold by the trustees, no question can arise as to that. As to the remainder, the decision in Hannum *v.* Spear, which will be relied on, was merely that the debts were liens; the other remarks

are but *dicta.* 13 S. & R. 259 was a sale under a power to pay debts and educate children. But whatever may be the value of the *dicta* in these cases, they are not applicable since the acts of 1832 and 1834. The cases were before the commissioners: and the act provides that purchasers from executors under such powers may pay the purchase-money into the Orphans' Court, and thus be discharged from the application of the purchase-money. §§ 20, 42, and 43 of the act of 1834 are also referred to, as showing that it was not intended to permit a sale under a power to discharge the lien of debts. The act of 1832, §§ 33, 45, also requires executors to give security, and the sale to be public.

These enactments provide a safe and convenient system, amply sufficient for the purposes of the estate. The English cases, and those already cited, therefore, do not apply.

But this is not a power to sell for debts generally, but for those not otherwise provided for; and the purchaser was bound to see that there were debts not provided for. And it is given to trustees, and not executors. The distinction is not unimportant; the latter are subject to the Orphans' Court, while it would appear the former are not. But the case here is not within the rule that a purchaser is not bound to see to the application of the money. The sale was to an executor, who is bound to pay the debts: 2 Raw. 392; 7 Barr, 48. It was a private sale; it was for a nominal consideration, and within a few months after the testator's death, and before it could be ascertained the money was wanting to pay debts. Of these things the papers gave sufficient notice. If the necessity for the sale did not arise then, the purchaser is affected.

*Williams,* contrà.—The purchaser had no notice that the sale was not *bonâ fide.* Mrs. Duval was then rich; she was not a trustee as to this land, and had no connexion with the trust. So distinct was her estate, that the purchase was subject to it. There is no rule that an executor may not purchase from an heir, and the parties are in effect in this position; it is even settled that where the trust is once divested the trustee may purchase: 7 Barr, 50; 6 W. & S. 18. The conveyance of the trustees passed the same estate that was in them, which was the remainder.

The power here was not a general one, but for payment of unscheduled debts. If such a power may be exercised so as to discharge the lien created by act of Assembly, the only one then existing, it was so here; and that it can have this effect is ruled in 1 Yeat. 380, 2 Dall. 291, 13 S. & R. 259. The acts of Assembly

have no bearing on the case. They were intended to free purchasers from specific liens, and for cases where no one was authorized to exercise the power. The purchaser was not bound to see that there were debts to be paid. If he were, the rule falls to the ground; for the impossibility of ascertaining the fact exists there, as well as in seeing to the ultimate application of the money: 9 S. & R. 71; 3 R. 237; 3 Sug. Vend. 154. The trustees here are subject to the same jurisdiction as executors; in fact, the latter in such cases are but trustees.

*Reply.*—It is said the trustees only conveyed the estate they held, which was subject to the life-estate of Mrs. Duval. But what has been sold here? Certainly the entire fee. Her life-estate merged in the reversion, and the fee was mortgaged for her debt. It is settled, that a sheriff's sale for the debt of the heir or devisee, or indeed of any one, discharges as well liens on the title of the ancestor or previous owner, as those created by the defendant in the execution. To the extent of her life-estate, there was no discharge of liens by the trustees' sale ; and, when the sheriff sold, so much as that was worth was of course liable to the debts of her devisor, being liens paramount to the mortgage. The act of Assembly says nothing about specific liens ; its plain intent was at once to furnish means by which all purchasers under testamentary trustees, &c., should be protected, whilst at the same time the rights of the creditors of the estate were guarded.

*April* 28. BELL, J.—The primary question is, whether, under a *bonâ fide* execution of the power to sell, conferred by the will of James S. Duval, the vendee of the trustees, on payment of the purchase-money, could assert a title, discharged of the general debts of the testator, or whether the purchaser was bound to see to the application of the price in payment of the debts ?

The English equitable rules, applicable to devises of this sort, are, that where the trust is of such a nature that the purchaser may be reasonably expected to see to the appropriation of the fund raised by the sale—as, if it be for the payment of legacies or of debts scheduled or otherwise specified—he is bound to see the money duly applied. But where the trust is not of such a character ; as, for instance, where it directs the payment of debts generally, the buyer is not compellable to supervise the application of the avails of the land, although he may have notice of the debts ;

for, as is said, one unconnected with the execution of a trust so unlimited and undefined, cannot be expected to enforce the due observance of it.     The rule is the same where the devise is for the payment of debts generally, and also for the payment of legacies; because, to hold a purchaser liable to see legacies paid, would in fact involve him in the account of the debts which must be first paid.     For the same reason, the principle doubtless embraces a direction like the present, to pay debts and distribute any remaining surplus among children: 3 Sug. on Vend., Am. edit. of 1848, 155, and cases cited.     This rule is so highly respected, that it has been permitted to operate for the protection of an heir or devisee in the enjoyment of unsold lands, where, by sale of part of the testator's estate, a sufficient sum was raised to pay debts and legacies, and the creditors and legatees have been restricted to their remedy against the trustee; for, says the case, the estate is not debtor for the fault of the trustee: Anon. 1 Salk. 153.     In noticing this determination, Mr. Justice Duncan observed, in Grant v. Hook, 13 S. & R. 262, "The reason is a sound one; for where the act is a breach of duty of the trustees, it is fit that those who deal with them should be affected by an act tending to defeat the trust of which they have notice.     But, where the sale is made by a trustee in performance of a duty, it would seem extraordinary that they should not be able to do that which is indispensable to the right exercise of it—the power to give a discharge."

Notwithstanding that by our system all the debts of a decedent become liens upon the land left by him, the English doctrine was approvingly noticed in Spear v. Hannum, 1 Y. 380, 553, S. C., 2 Dal. 291, as applicable here, though the case did not call for an authoritative determination to that effect.     But afterwards, in Grant v. Hook, decided in 1825, the very point was presented for decision.     In that case, the executors were authorized to sell and convey such parts of the real estate as might be found necessary to pay the debts of the devisor and educate his minor children. There was also a direction to pay a specific debt secured by mortgage of a particular tract, executed by a son of the testator, who held the legal title.     Under this clause, the question was made, whether it amounted to such a specification of debts as bound the purchaser to see the money applied to the payment of that debt or the debts generally?     After much consideration, it was solemnly determined that the trustees' vendee took the land free of the general debts of the testator, though specific encumbrances by mortgage, judgment, recognisance, and the like, remained undis-

turbed; and it would not do to say the direction, as to the son's mortgage, brought it within the description of enumerated debts; for that would be to say *that* debt alone was charged on the lands of the testator, contrary to his manifest intent.

This determination has never been impeached, nor in any way called into question. Nor is it desirable it should be shaken, if the remark made by C. J. Chew, in Spear *v.* Hannum, be correct, that "the execution of powers of this nature has proved highly beneficial to creditors, and has greatly conduced to the interest of the representatives of deceased persons." In the same case, the court asked, "What sound principle of policy or reason can be shown, discriminating between a *bonâ fide* sale of real estate, by executors duly empowered, and a sale of personal estate by them or by administrators, in the course of administration?"

It is, however, objected that these cases were, before the acts of 1832 and 1834, which, it is said, establish a convenient and safe system for the sale of encumbered estates left by deceased persons, equally conservative of the interests of the estate and the rights of the claimants, and intended to supply and supersede the rules adopted from the English chancery. The 33d section of the first of these acts prohibits the Orphans' Court to grant to an executor, administrator, or guardian, an order to sell the lands of a decedent for the payment of debts, until they shall, respectively, exhibit an inventory and appraisement of the personal estate, and file, in the office of the clerk of the court, a bond, with sufficient surety, conditioned for the faithful application of the proceeds of sale.

The 19th section of the later act enacts that, "whenever any sale shall be made of real estate by any executor or executors, in pursuance of any authority, power, or direction contained in a will, or by force thereof, and of this act, either for *the payment of debts* or of legacies, for the support of minor children, or for distribution of proceeds, or other purposes, the purchaser of such estate may pay the purchase-money, or consideration of such sale, into the Orphans' Court having jurisdiction of the accounts of such executor or executors, or, with leave of such court, to such executor or executors, to be disposed of according to the uses and trusts contained in such will; and such payment shall be deemed valid against all persons having, or who may have an interest therein." The 20th section authorizes an executor or administrator, on a deficiency of personal assets to pay debts, to sell, under the direction of the Orphans' Court, so much of the real estate as shall be necessary to supply the defi-

ciency; *and such real estate so sold, shall not be liable in the hands of the purchaser for the debts of the decedent."*

These statutes are, certainly, pertinent to sales by executors and administrators, in payment of debts. But, in the absence of an expressed intention, there is nothing in them to justify a conclusion that the legislature designed the repeal, by implication, of a long-settled and prominent rule of property. Such a conclusion is never permissible where a statute may be construed in unison with the existing law. Accordingly, it has grown into a maxim, that legislative enactments are to be expounded as near to the use and reason of the prior law as may be, when this can be done without violation of its obvious meaning; for, say the cases, it is not to be presumed the legislature intended to make any innovation upon the common law, further than the case absolutely required. The acts in question not only admit of such harmonious construction, but strongly invite it. That of 1832 is, in this particular, but a repetition of the older act of 1794; and the provision, therefore, formed a part of our law, prior to the decision of Grant *v.* Hook. It relates, too, altogether to judicial sales, or mortgage of estates, by virtue of an order of court, which, disclaiming the confidence upon which the devise of a power is based, always exacts security from the agent employed, faithfully to execute the behests of the law. It has, consequently, no reference to a sale made under a last will. As to the 19th section of the act of 1834, it is obvious it was intended to confer an additional privilege on executors and purchasers, as a further guaranty of their safety. So far as it relates to the payment of debts, it has application only to those cases where a simple execution of the power to sell will not relieve the purchaser from responsibility; as, for instance, where the debts are scheduled: and its provisions may be had recourse to where doubts exist of the legal consequences of a sale. It is only in such instances the provision was necessary. It will not be pretended the legislature designed to extend or increase the risks of the purchaser. But, if we convert the option implied by the terms "may pay the purchase-money into court," or, with the leave of the court, to the executor, into the imperative command, "shall pay," under penalty of becoming liable for a misapplication of the fund in *all* cases, we add to pre-existing burdens by means of a statute intended for further protection and relief. The *italicised* clause of the 20th section was also copied from the act of 1794. In giving it a construction, it was early held, that sales made in pursuance of the statute divested the lien of all the debts of a

decedent, general and specific, including judgments, recognisances, and other debts of record: Molier *v.* Noe, 4 D. 450; Girard *v.* McDermot, 5 S. & R. 128. But no one ascribes this effect to the execution of a private power, for the reason that no one has before thought the act had any relation to such powers. It is, in truth, by its very terms, confined to judicial sales. It can, therefore, have no influence on the determination of our question, unless it can be established that the law-makers intended, by this enactment, to cut up by the roots testamentary directions to sell for payment of debts. This has not yet been pretended.

The power given by our testator's will to sell for "payment of debts not otherwise provided for," extends to all debts not specifically provided for by the will itself. The debts so provided for, are only mortgages, which are specific liens on the devised property. Those not provided for, are thus left at large, as undistinguished and uncertain, as if the devise had been for payment of debts generally. There is nothing in the will, or by reference to anything *dehors*, from which a purchaser could ascertain these debts. This devise is, consequently, within the principle I have stated, as settled by the adjudications referred to; unless, indeed, there be something in the objection that this sale was directed to be made by testamentary trustees, not *executors of the will*. But this works no difference in the operation of the rule, for it is applicable to all trusts of this nature, no matter by whom executed. It is urged the attempted distinction is not without a difference with us, since executors are here amenable to the Orphans' Court, and may be required to give security, while other trustees may perhaps not be subject to this jurisdiction. This, if true, would scarce afford room for a novel exception to an old and familiar rule. But it fails in fact, for, by our statutes relating to the subject of trusts, the agents for their administration, whether nominated by deed or last will, may, in a proper case, be compelled to give security under penalty of dismissal.

That this sale was effected through private negotiation, and not by public outcry, impugns not its validity. It does not come within the doctrine settled by McCreery *v.* Hamlin, 7 Barr, 87, for the trustees were expressly authorized to sell either publicly or privately. Were this even not so, the act of 14th March, 1849, enacted since the decision just cited, makes good prior private sales, except where the instrument, directing the sale, expressly requires it to be public.

But it is further objected that the property was sold to the

executrix named in the will, for a nominal price, and before a deficiency of personal assets could have been ascertained. · The conveyance to Mrs. Duval was made to enable her, as executrix, to raise funds by pledging the estate in mortgage, for payment of the debts of the estate, and it was actually mortgaged by her to Mr. Parker for that purpose. Still, as the conveyance to her was not a due execution of the power to sell, it would avail nothing were the question between her and the creditors of her husband or other party beneficially interested in the estate. But it is to be observed there is nothing on the face of the deed to excite suspicion of irregularity or undue exercise of authority on the part of the trustees. It is drawn in the usual form, and purports to convey the fee in pursuance of the power given by the will, for a full consideration paid by the grantee. Nor is it pretended the mortgagee had actual notice of the real character of the transaction. That the vendee was also executrix, tended in no degree to impeach the title. It is very true, a trustee cannot purchase at his own sale, except subject to the condition of avoidance at the pleasure of the *cestui que trust;* for the policy of the law forbids that the seller should also be the buyer, where the interests of third persons may be involved: Bruch *v.* Lantz, 2 R. 392; Chronister *v.* Bushey, 7 W. & S. 152. But where an executor or administrator stands unconnected with the trust, there is no principle denying him the right of becoming the purchaser from the trustee. *Cessante ratione, cessat lex.* For the same reason, he is not considered as within the policy of the prohibition where, before the sale to him, the trust has been determined: Painter *v.* Henderson, 7 Barr, 50; or where the subject of it has been taken out of the hands of the trustee by an agent acting by paramount authority; as, for instance, where the sale is by the sheriff, by virtue of legal process against the creator of the trust: Prevost *v.* Gratz, 1 P. C. C. 373; Fisk *v.* Sarber, 6 W. & S. 18. Here Mrs. Duval was an entire stranger to the trust to sell, and, consequently, at full liberty to buy. Parker thus stands in the predicament of a *bonâ fide* mortgagee of a title, fair and regular on its face, without notice, actual or constructive, of anything calling for further inquiry. Now, it is settled that, though a fraudulent sale by an executor, under a power in a will, may be void as respects a purchaser party to the fraud, yet a *bonâ fide* second purchaser, without notice, will be protected: Price *v.* Junkin, 4 W. 85. A mortgagee for value is within the same equity. It follows that Parker is unaffected by the want of consideration for the conveyance to Mrs. Duval.

Another consequence is, that her failure to apply, in discharge of the testator's debts, the fund received on the security of the mortgage, is, so far as the mortgagee's rights are concerned, matter of indifference.

That branch of the objection which is based upon the possible sufficiency of the personal estate to pay the debts, was but faintly urged, and is easily answered. It is true, that personal assets form the primary fund for payment of a decedent's debts, even though realty be devised for the purpose: Keyzey's case, 9 S. & R. 72; Walker's estate, 3 R. 237. Yet, if the proceeds of the latter be first applied, it does not invalidate the title made under the devise. Its legal effect is but to confer a right on the heir or residuary devisee, to call upon the personal fund, leaving conflicting claims to be adjusted by marshalling the assets of the debtor estate. As was justly observed on the argument, a fair purchaser for value is not bound to see that the personal estate is exhausted, before taking title. If he were obliged to ascertain the kind, quality, and value of such assets, and to take care that it had been rightly applied in discharge of debts, before he could safely accept his deed, a testamentary power of sale would be useless. Even in the ordinary case of such a power exerted by the executor of the will, an attempt to ascertain the application of the personalty, would be attended with so much inconvenience and uncertainty, as to furnish a reason why it ought not to be required; just as a similar consideration operates to exonerate the purchaser, in the case of a devise for payment of debts at large. Where, as here, the sale is effected by a trustee other than the executor, the reason is still more forcible, as the existence of personal estate, and its competency to pay debts, is peculiarly within the province of the latter.

On a review of the whole case, we have failed to discover any fact or principle that ought to have led the court below to a conclusion differing from that adopted.

Decree affirmed.